## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **Criminal No. 19-10459-RWZ** |
| | **)** | |
| **9. ANGEL ROLDAN** | **)** | |
| **A/K/A "King Big A,"** | **)** | |
| **A/K/A "Nelty,"** | **)** | |
| Defendant. | **)** | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
## FOR RELEASE FROM CUSTODY

The United States of America, by Andrew E. Lelling, United States Attorney, Glenn A. MacKinlay, and Rachel E. Goldstein, Assistant United States Attorneys, hereby respectfully oppose Defendant Angel Roldan ("Roldan" or "the Defendant") Motion For Release From Custody (the "Motion"). [D. 726].[1] Roldan seeks release to home confinement because he claims that he is at risk of contracting COVID-19 due to his incarceration.

The Government appreciates the gravity of the COVID-19 pandemic and acknowledges that it presents a serious national and state public health emergency. Roldan's Motion, however, alleges only a speculative prospect of a COVID-19 outbreak at the Plymouth County House of Corrections ("Plymouth") where he is housed. Moreover, Roldan identifies no particular risks to his health condition, and identifies only systemic risks that apply to all detained individuals. He also fails to acknowledge the extensive precautionary measures implemented at Plymouth to prevent the introduction or transmission of COVID-19 in the facility. The possibility of a person without any unique health vulnerabilities contracting COVID-19 is not grounds for release.

---

[1] Docket Entries are identified by docket and page numbers.

Furthermore, even if he could show a particularized risk to him, Roldan would still not be entitled to release under the detention calculus of 18 U.S.C. § 3142 because he cannot overcome the evidence in support of detention.  Even in the midst of this pandemic, the factors set forth in 18 U.S.C. § 3142 still guide the Court in determining, on a case-by-case basis, whether pretrial release is appropriate.  Government is prepared to adduce substantial evidence to demonstrate that Roldan poses a danger to the community, risk of obstruction, and risk of flight, and that no conditions or combination of conditions can adequately address these risks.  Because Roldan's Motion does not demonstrate that the emergent COVID-19 pandemic alters this conclusion, and fails to overcome the evidence in favor of detention, it should be denied.

## BACKGROUND

On December 4, 2019, a Grand Jury sitting in the District of Massachusetts indicted Roldan, along with dozens of others, for conspiracy to conduct enterprise affairs through a pattern of racketeering activity ("RICO conspiracy"), in violation of 18 U.S.C. §1962(d).  [D. 1].  Roldan made his initial appearance on December 5, 2019, and the government moved for detention.  [D. 17, 12].  The Government's detention motion was supported by a 190-page affidavit by Special Agent Dominic Coppo (the "Detention Affidavit") detailing a portion of the investigation's findings, both with respect to Roldan and more than 60 co-defendants [D. 12-1].

Roldan agreed to detention without prejudice, and now seeks release and requests the Court to hold a detention hearing.  [D.726 at 1].[2]

Roldan is currently housed at Plymouth.  In response to the COVID-19 pandemic, Plymouth has announced that it is following Massachusetts' Department of Public Health guidance

---

[2] The Government construes the defendant's motion for pretrial release to have been brought under the provisions of 18 U.S.C. § 3142.

to minimize the risk of introduction and transmission of the virus, and it has instituted a "vigorous process of screening and cleaning continuously around the clock."[4] On March 23, 2020, Plymouth announced that one of the Sheriff's Department's employees had tested positive for COVID-19. The employee was quarantined, and Plymouth immediately took steps to minimize the risk of transmission: all areas within the facility in which the staff member had been were disinfected, and staff members who had had exposure within 6 feet of the staff member for more than 15 minutes were directed to self-quarantine and not allowed to return to work for 14 days or until they tested negative for the virus.  Further, upon conducting an assessment of who had been in proximity to the infected staff member, Plymouth determined that no federal detainees had been in contact with him/her.  As of April 23, 2020, there are no further reported cases of COVID-19 among Plymouth staff or inmates.

## DETENTION HEARING EVIDENCE

The Government moved for detention under 18 U.S.C. § 3142(f)(1)(C) & (E), and (f)(2)(A) & (B).  The parties have agreed to proceed by a proffer of the evidence.  The Government offers the following evidence in support of its motion for detention.

### A.  THE DETENTION AFFIDAVIT

#### 1.  RICO is Coming

The defendant was identified as a vocal gang member who was well aware of the charges he, and other members of the gang would face, including racketeering offenses. As the detention affidavit filed in this case details, Roldan stated in a recorded meeting of the Latin Kings on August 31, 2019: "We all gonna be fucking in an indictment. I'm gonna be down for a RICO.

---

[4] These announcements have been posted to the Plymouth County Sheriff's Department website, available at: https://www.pcsdma.org/covid.html.

You gonna be down for a RICO. You gonna be down for a RICO. We all gonna be down."

Exhibit 1, p. 1; above the fold.[5]

### 2. Roldan's Position of Leadership

Roldan was identified as the former Cacique for Massachusetts for the Latin Kings, who had historically held leadership roles in the D5K Chapter. Roldan's role and membership in the Latin Kings has been confirmed by his attendance at numerous meetings of the State Team and D5K cyphers, and also through recordings where he is present and exercising a leadership role over Latin Kings affairs, communication with other leaders and he is also referred to by other Latin Kings as a member. *Id.* at p. 18-19; para. 42.

### 3. The Disciplining of Roldan

In 2019, Roldan was brought to trial for a number of violations of Latin Kings rules. These violations included taking money from the D5K fundo for firearms that never materialized. Roldan was found guilty at trial and ordered to repay various members of the Latin Kings.  When he had not paid back those individuals and gang leader Liberato issued an order to kill Roldan.  According to CW-9, the plan was that Roldan was to be murdered outside of his residence in Lowell, MA.  CW-9 intervened to stop the murder, and FBI alerted Roldan to the threat.  The various meetings and trial were recorded. *Id.* at p. 51; para. 51, 161-168.

Roldan didn't take this well.  An August 31, 2019 meeting of the Massachusetts State leadership team was held to address the termination order issued by Liberato and clear the air

---

[5] Indeed, the detention affidavit is littered with references to Roldan.  There are *113 times* that his name appears in the document, establishing the basis for his detention as a dangerous gang leader.

between the leadership. This meeting was recorded.  At the meeting were Cecchetelli,

Liberato, Jorge Rodriguez, and others.  The following is an excerpt from the draft transcript:

Roldan:        I want, I, I want to know how somebody gonna send any kill, green
light, violation, I got six months. I still got a month right now. You can't send no—

-------------------------------------

Roldan:        Bro, I didn't forget nothing. My memory, bro, y'all niggers think I'm chillin' but I
watch everything. That's why you watching my Instagram, snap, everything like, bro is, you
could call me. All this green light this, this, bro. You just jeopardized the Nation,
brothers, everything. Bro, I wasn't going out like that, niggers know me. You got a gun license,
you got everything, why you didn't come? Why—no disrespect to nobody here—why you
didn't come, bro you got two gun safes bro, why you didn't come?


-------------------------------------


Roldan:        No disrespect to the Nation but I would've took everybody out,
bro, Trey put my camera system up, he know what it is.

Peduero-Colon: Yep.

Roldan:        No disrespect, you know Trey, like that shit still work, bro.

Liberato:        Well I was, I was—

Roldan:        Come to me like a man, bro. Not like no, no, no little girl. Come to
me like a man.

Roldan continued to express the fact that if he were to be shot at then he would

have killed everyone who came for him ("I would've took everybody out").  Cecchetelli

acknowledged that if the gang members "would have followed through with that order and

sent people to Big A's, it would have been a fucking bloodbath." *Id.*

### 4.  Some Acts in Furtherance

The detention affidavit also describes numerous acts Roldan did in futherance of the

Latin Kings enterprise.  For example:

### a) Paperwork

According to CW-9, Roldan acquired paperwork confirming a victim's cooperation and informed Jorge Rodriguez, who ordered the termination of the victim.  A November 18, 2018 recording captures Roldan, Jorge Rodriguez and CW-9 discussing how Roldan is frequently consulted regarding obtaining paperwork on persons believed to be cooperating with law enforcement and that Roldan knows how to read paperwork concerning whether an individual is an informant. The Latin Kings have a practice of acquiring paperwork on persons who they believe are providing information to law enforcement in order to document their cooperation, identifying witnesses, including the witness who could not be located on the trial date. *Id.* at p. 57.[6]

### b) Relayed Green Lights

Roldan also passed along "green lights," authorizations to murder, to other members including on two rival gang members from Lucerne Street. *Id.* at p. 68-69; para. 212.

### c) Ordered Green Lights

Roldan ordered terminations as well, including sending a gang member to Fitchburg to handle the termination of a victim believed to be cooperating. *Id.* at p. 96; para. 271.

### 5.  Roldan's Drug and Gun Activity

Roldan was also involved in drug and gun dealing.  For example, on June 14, 2018, CW-3 and Roldan went to fellow gang member, Angel Ortiz's house to cut approximately 100 grams of heroin. Angel Ortiz was present and assisted in processing the heroin. Exhibit 1, p. 24; para. 69.  On two separate occasions, June 8, 2018 and July 3, 2018, CW-3 purchased 50 grams of

---

[6] This practice is detailed in the detention affidavit.  The word "paperwork" appears in the document *22 times*.

heroin from Roldan. *Id.*, p. 60-61; para. 187-188. The drug deals were recorded.  On July 26, 2018, CW-3 purchased a Hi-Point, .45 cal. Handgun, magazine, and 30 rounds of .45 caliber ammunition from Roldan. The gun deal recording stopped recoding during the transaction, but recorded calls discussing and arranging the purchase were captured.

    **B.**    **THE RECORDINGS**

The Government submitted the following twelve exhibits for the detention hearing.  A series of recordings were further admitted.  These materials pertained to the following incidents: They are:

    Exhibit 1 – The Detention Affidavit

    Exhibit 2 – Excerpt from a 10/14/18 call with Roldan (on phone, calling in to a meeting)

    Exhibit 3 -- Excerpt from a 10/14/18 call with Roldan (Lucerne)

    Exhibit 4 -- Excerpt from a 10/14/18 call with Roldan (Lucerne war)

Each of these recordings reflect the Latin Kings discussion that Lucerne was a rival gang and may be attacked by members of the Latin Kings and supporting incarcerated members. *See also id.* at p. 68-69; para. 203, 212-213; and 231.

    Exhibit 5 – Excerpt of the 1/12/19 Cypher meeting

    Exhibit 6 – Draft transcript of the excerpt of the 1/12/19 Cypher meeting

At this meeting aimed at uniting the D5K chapter, Roldan says "If you keep throwing up crowns, we are gunna shoot you in the leg."  Finally, Roldan informed the members that a failure to report to D5K would result in the offenders being killed. *See also id.* at p. 87; para. 255.

    Exhibit 7 – Excerpt from the 8/31/19 State Team meeting

    Exhibit 8 – Draft transcript of the Excerpt from the 8/31/19 State Team meeting

At this meeting, also discussed above, Roldan warns of a pending indictment and complains that centralizing the decision-making process in such meetings demonstrates the inner workings of the Latin Kings criminal enterprise and makes it easier for law enforcement to capture and document the racketeering conspiracy.

> Exhibit 9 -- Excerpt of 11/18/18 meeting recording (#1)
>
> Exhibit 10 -- Excerpt of 11/18/18 meeting recording (#2)
>
> Exhibit 11 -- Excerpt of 11/18/18 meeting recording (#3)
>
> Exhibit 12 – Report describing the contents of the 11/18/18 meeting recording

Here are a few highlights of this meeting:

- Roldan indicated that he is scared about getting charged by law enforcement and doing 30 years.

- Roldan says he is the only one that makes decisions for the ALKQN.

- Roldan indicates that he does not talk crazy in the meetings due to possible informants being present at these meetings.

- They discuss ALKQN members from the D5K Boston to sell drugs for Jorge Rodriguez in New Bedford.

- Gang member Jorge asked if the ALKQN are going to retaliate for the murder of gang member Pena because he has all the information on who killed him. Jorge indicated that he has to avenge Pena's death because they were so close.

## C.    ROLDAN'S CRIMINAL RECORD

Roldan was previously convicted in this U.S. District Court on charges of conspiracy to distribute cocaine base, and distribution of cocaine base as part of a prior federal investigation of the Latin Kings in 2006 and sentenced to 68 months in prison. *See U.S. v. Follis, et. al.,* Docket No. 06-CR-10267-NMG. Exhibit 1, p. 18-19; para. 43.

## LEGAL STANDARD

A defendant must be detained pending trial if, after a hearing, the court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e).[7]   The government bears the burden of demonstrating that the defendant poses a danger to the community by clear and convincing evidence, or that the defendant poses a flight risk by a preponderance of the evidence.  *See United States v. Rose*, 2012 WL 2500497, *1 (D. Mass. 2012) (Gorton, J.).

In determining whether any conditions of release will reasonably assure the defendant's appearance and the safety of any other person and the community, the Court must consider the factors set forth in 18 U.S.C. § 3142(g), which include: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that the defendant's release would pose to any other person or the community.

Additionally, the Court may "permit the temporary release" of the defendant to the custody of "a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).  The defendant carries the burden of showing that his release is necessary to the preparation of his defense or for another compelling reason.  *See United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011) ("A defendant has the burden of

---

[7] As noted by the Senate Judiciary Committee: "This reference to safety of any other person is intended to cover the situation in which the *safety of a particular identifiable individual, perhaps a victim or witness*, is of concern, while the language referring to the safety of the community refers to the danger that *the defendant might engage in criminal activity to the detriment of the community*."   S. Rep. No. 98-147, at 39 (1983) (emphasis added; footnotes omitted); *see also United States v. Patriarca,* 948 F.2d 789, 792–793 (1st Cir. 1991).

showing that temporary release is 'necessary for preparation of the person's defense' under Section 3142(i).") (citations omitted).

## **ARGUMENT**

Roldan's Motion makes only passing reference to the statutory factors that guide the detention analysis, and instead argues for release only on the general grounds that the COVID-19 pandemic "poses a grave risk to his safety, in violation of his liberty interest in avoiding pretrial punishment as well as his due process right to adequate medical care."  [D. 726 at 5].  However, Roldan identifies no particularized concerns regarding his health condition, he fails to provide any evidence to support his conclusory claim that Plymouth is unequipped to provide adequate medical care to him, and he instead refers only to systemic, generalized concerns that apply to all detained individuals.  Such generalized concerns do not warrant release.

Moreover, the COVID-19 pandemic—while undoubtedly serious and necessitating strong precautionary steps, particularly in detention facilities like Plymouth—does not alter the facts and circumstances particular to Roldan that demonstrate his danger to the community and risk of flight, and therefore does not warrant his release.  Indeed, Roldan makes no effort to demonstrate that he does not pose a danger to the community, or a risk of obstruction or flight, and therefore fails to rebut the statutory presumption in favor of detention.  His cursory claim that the Court can fashion conditions to reasonably address these risks is thus entirely unmoored from the facts.

The Government can readily carry its burdens of showing that no condition or combination of conditions can reasonably assure the safety of the community or his appearance as required, his Motion should be denied.

### A.     The Section 3142(g) Factors Weigh Heavily in Favor of Detention

Roldan's Motion makes only passing reference to the 18 U.S.C. § 3142(g) factors the Court must consider when determining whether any condition or combination of conditions can

reasonably assure the safety of the community and the defendant's appearance.[8]  Under Section
3142, if a court finds that no condition or combination of conditions can reasonably assure the
safety of the community and/or the defendant's appearance as required, it shall order the defendant
to be detained pending trial.  *See* 18 U.S.C. § 3142(e)(1).  An examination of these factors
demonstrates that Roldan should be detained.

The Government's evidence at the hearing demonstrates that Roldan poses a danger to the
community, a risk of flight, and a risk of obstruction, and that no condition or combination of
conditions can reasonably address these risks if he were released.  Indeed, each of the factors weigh
heavily in support of detaining Roldan.  For example:

(1) the nature and circumstances of the offense charged, including whether the offense is
a crime of violence;

Leadership of a violent gang with dozens of acts of violence and conspiracies to commit
murder.

(2) the weight of the evidence;

Recorded meetings and calls of Roldan corroborating the cooperating witnesses that
attended the meetings.

(3) the history and characteristics of the defendant;

Prior criminal record includes a federal conviction in a prior Latin Kings investigation.

(4) the nature and seriousness of the danger that the defendant's release would pose.

---

[8] Roldan's Motion mischaracterizes the standard for detention.  He states that "[e]ven if
the Court determines that release on personal recognizance will not reasonably assure" his
appearance or the safety of the community, "the Court should order" his pretrial release subject to
conditions, and "must consider" the Section 3142(g) factors "[i]n naming conditions."  [D. 726 at
4-5].  Section 3142(g) instructs to the court to consider certain factors when determining whether
conditions can be fashioned to address the risks of dangerousness and/or flight, but the court is not
required to order a defendant's pretrial release if it determines that no such conditions exist.

Roldan is committed to the tenets of the Latin Kings and checked paperwork for snitches and provided authorization to kill them and warned that he would shoot any member who came after him.

**B.**      **The Emergence of COVID-19 Does Not Warrant Roldan's Release**

Roldan's argument for release relies entirely on generalized fears about the specter of a COVID-19 outbreak at Plymouth.   However, the COVID-19 pandemic—while undoubtedly serious and necessitating strong precautionary steps, particularly in detention facilities like Plymouth—does not alter the facts and circumstances particular to Roldan that demonstrate his danger to the community, and therefore does not warrant his release.

     **1.**      <u>**The Speculative Risk of COVID-19 Is Not A Compelling Reason For Release**</u>

Even on a liberal reading of Roldan's Motion—which does not substantively address the Section 3142(g) factors—he fails to demonstrate that the COVID-19 pandemic warrants his release because he does not raise any particularized concerns about his health condition or situation at Plymouth.   Roldan does not claim that he has any underlying medical conditions that place him at a higher risk of developing serious complications if he were to contract COVID-19, or which otherwise make him any more vulnerable than any other detainees.   And although he asserts in conclusory fashion that "COVID-19 presents a grave and deadly threat in high-risk settings" such as Plymouth, he does not cite any of the particular "infection-amplifying conditions" at Plymouth that put him at risk.   Moreover, he does not argue that Plymouth administrators and staff have failed to implement adequate measures to prevent the spread of the virus.

Nor does Roldan offer any evidence that there are any positive COVID-19 cases at Plymouth, or suggest that he has come into contact with any affected individuals at Plymouth. Roldan merely claims, without citation to any authority, that "[a] staff member at the institution may be infected."  [D. 726 at 2].  As discussed above, on March 23, 2020 Plymouth announced

that one employee had tested positive for COVID-19; however, Plymouth took aggressive—and successful—measures to isolate that staff member and prevent the spread of the virus to any other staff members or detainees at Plymouth.  As of April 23, 2020—more than seven weeks after the first reported COVID-19 case in Massachusetts[9] there is not a single case among the current detainees detainees currently  housed at Plymouth.[10]

Roldan also fails to demonstrate that his release is warranted based on the factually and legally distinguishable caselaw he cites in support of his assertion that "there is no greater necessity than keeping a defendant alive, no matter the charge."  [D. 726 at 5].  Although the courts have recognized that a defendant's medical condition can be a compelling reason justifying temporary release, they have only done so "sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries."  *United States v. Hamilton*, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020).  Indeed, in the rare cases where courts have found a medical condition to be a compelling reason for release, the defendants were actually suffering from severe medical conditions that could not be adequately treated at their detention facilities.  *See, e.g., United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993) (releasing defendant who suffered from terminal AIDS that could no longer be managed by correctional authorities, where he was unlikely to survive long enough to stand trial, and "the restrictive terms of his house arrest," in connection with his physical incapacitation, "would effectively incapacitate [him] to the same extent as prison"); *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143, 145 (D.P.R. 2002) (releasing defendant who sustained significant injuries from bullet wounds,

---

[9] *See* Mass.gov, First Presumptive Positive Case of COVID-19 Identified by Massachusetts State Public Health Laboratory (March 2, 2020), *available at* https://www.mass.gov/news/first-presumptive-positive-case-of-covid-19-identified-by-massachusetts-state-public-health.

[10] *See* Mass.gov, COVID-19 cases in Massachusetts (April 15, 2020), *available at* https://www.mass.gov/info-details/covid-19-cases-quarantine-and-monitoring.

including open wounds that required continued medical treatment that the Bureau of Prisons could not treat; the Marshal Service paid for the services of guards to supervise him; and he was unable to walk, suffered from partial paraplegia, remained in a lying position, had loss of function in his arms, and was thus not "mobile enough to roam in the community.").

Similarly, in other cases where the courts have released defendants based on their medical condition, the courts emphasized that the defendants had significant, life-threatening health problems that could not be treated in their detention facilities, and found that there were conditions of release that could ensure the safety of the community. *See United States v. Johnston*, No. 17-00046 (RMM), 2017 WL 4277140, at *4 (D.D.C. Sept. 22, 2017) (finding that the defendant's "need for prompt cancer testing and treatment, paired with his belief" that his continued detention would delay such treatment "to a degree that imperils his life, rebuts the statutory presumption of detention," and that the court could ensure the safety of the community by imposing stringent "release conditions tailored to the nature of the charges [he] face[d] and his need for medical treatment."); *United States v. Adams*, No. 6:19-MJ-00087-MK, 2019 WL 3037042, at *2 (D. Or. July 10, 2019) (defendant rebutted presumption by showing "evidence of an extraordinary life-threatening medical condition the BOP cannot treat and further show[ing] the safety of the community may be reasonably assured through conditions of release.").

But Roldan does not argue that he has contracted COVID-19, or even that he has an underlying condition that makes him more prone to serious complications if he were to contract it—he only raises concerns about the possibility of contracting it, even though there have been no reported cases among detainees at Plymouth in the more than six weeks since the first reported COVID-19 case in the Commonwealth. Nor does Roldan demonstrate that he would not be able to receive adequate medical care at Plymouth if he were to contract the virus. This falls far short

of the severe injury and urgent need to obtain care outside of a detention facility that warranted release in other cases.

Indeed, as several courts have held, the speculative risk of a COVID-19 outbreak is not a compelling reason for release under Section 3142(i)—even in cases where the defendant has an underlying medical condition that increases his or her risk of severe illness from the virus. *See, e.g., United States v. Hamilton*, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (denying release despite the defendant's advanced age and history of stroke and heart attack where there were no reported cases of COVID-19 at his detention facility and the Bureau of Prisons was "taking system-wide precautions to mitigate the possibility of an infection within its facilities"); *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895, at *8 (D. Kan. Mar. 25, 2020) (denying release of defendant whose diabetes put him at increased risk of serious illness from COVID-19 where the risk of an outbreak at his facility was speculative, he did not show that his proposed release plan would reduce his overall risk, and his release would put pretrial services and law enforcement at increased risk); *United States v. Lunnie*, No. 4:19-CR-00180 KGB, 2020 WL 1644495, at *5 (E.D. Ark. Apr. 2, 2020) (COVID-19 was not a compelling reason warranting release under 18 U.S.C. § 3142(i) where the defendant's arguments about a potential outbreak at his facility were speculative, he failed to show that his "lifelong bouts with bronchitis" increased his risk of severe illness if he were to contract COVID-19, and he did not demonstrate that "his proposed release plan would necessarily alleviate his overall COVID-19 risks," or the risks to the community).

Accordingly, in a case like this, where the defendant raises only speculative concerns about the risk of contracting a virus, but does not suffer from a medical condition that requires treatment outside of the detention facility, and has made no effort to explain why his continued detention

would prevent him from obtaining adequate care if he were to become sick—there is no basis to grant release under 18 U.S.C. § 3142. *See United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (declining to reverse denial of motion for release based on health conditions under 18 U.S.C. § 3142(i) where the defendant did not identify any specific medical conditions and failed to "explain why his detention would prevent him from obtaining adequate treatment" for any condition that he did have).

### 2.   <u>Roldan Has Not Shown that Plymouth's Precautionary Measures Are Inadequate To Mitigate the Risks of COVID-19 to Detainees</u>

Roldan's generalized, speculative concerns that he could theoretically be exposed to COVID-19 because he is in a detention facility does not constitute a condition particular to him that displaces the compelling evidence in favor of detention.  This is particularly so because he requests release from a facility that has taken extensive precautionary measures to mitigate the risk of COVID-19 exposure and transmission.  Indeed, the sheriff's offices have taken steps to reduce the risk that the virus will spread.   On March 25, 2020, the Sheriff of Plymouth County described the efforts that the Sheriff's Department has taken to ensure a safe environment for inmates at Plymouth and reduce the risk of the introduction or spread of COVID-19 within those facilities. *See* Exhibit A, Affidavit of Sheriff Joseph D. McDonald, Jr.  These measures include:

1) Adopting enhanced inmate intake procedures, including scrutiny of travel and exposure to illness;
2) Adopting treatment and detection practices consistent with guidelines issued by the Center for Disease Control and Department of Public Health ("DPH"), and frequent consultation by the Sheriff's Department administrator with the DPH;
3) Suspending family and friend visits;
4) Restricting attorney visits to non-contact;
5) Restricting non-essential staff from entering the Facility;
6) Ceasing inmate work assignments that require travel outside the Facility;
7) Eliminating unnecessary movement within the Facility;
8) Establishing a housing unit for newly-admitted inmates and inmates who leave and return to the Facility, to monitor them for signs and symptoms of COVID-19 until they clear the incubation period;
9) Arranging for court hearings to be conducted by videoconference and telephone

to limit inmate travel outside of the Facility and resulting possible exposure;

10) Changing recreation and meal schedules to provide more space in dayrooms;
11) Maintaining an aggressive cleaning schedule for the housing units;
12) Educating staff and inmates on proper social distancing and sanitation practices.

*See id.*, at 1-2.  Sheriff McDonald's Affidavit also notes that Plymouth is "well below maximum capacity," which has "afforded the Department flexibility in making housing assignments which provide more space for the inmates." *Id.* at 2.

Roldan's Motion completely ignores the extensive risk-mitigation procedures implemented at Plymouth, and there is no indication that these measures are inadequate to control the transmission of COVID-19 in the facility.  Indeed, Roldan does not cite to any evidence whatsoever concerning the COVID-19 pandemic or the particular risk he faces if he remains in detention at Plymouth.  Instead, ignoring to all of the measures detailed above, he raises only a generalized claim that "jails are extremely dangerous in a pandemic, given the impossibility of social distancing in a confined space." [D.726 at 2].  But Plymouth's Pandemic Plan clearly addresses the factors that could enhance transmission risks in a correctional setting, including by implementing measures to aggressively clean the facilities and instruct detainees on proper hygiene and sanitation practices; adjusting housing assignments, recreation, and meal schedules to provide more space between detainees; and taking extensive measures to screen new detainees and limit visits from non-essential staff to mitigate the risk of exposure.  Plymouth has therefore pursued reasonable preventive measures that have been successful—indeed, to date there have been no reported COVID-19 cases among detainees.

Nor is there any merit to Roldan's suggestion that the current conditions of his pretrial detention amount to unconstitutional pretrial punishment, in violation of the Eighth and Fifth Amendments.  [*See* D. 726 at 3].  In this regard, he argues that the existence of the pandemic "poses a grave risk to his safety, in violation of his liberty interest in avoiding pretrial punishment

as well as his due process right to adequate medical care."  [D. 726 at 5].  This argument is frivolous: there can no constitutional concerns about pretrial detention in a facility that has taken infection-control measures that are not just reasonable but robust, and which have successfully thwarted the virus from entering the facility's doors, protecting 100% of detainees from acquiring COVID-19.  Moreover, far from being a form of punishment, Roldan's pretrial detention is clearly tailored to achieve a compelling government purpose: ensuring the safety of the community from a dangerous person and his appearance as required.

Moreover, despite his conclusory assertion that his detention violates his substantive due process right to adequate medical care, Roldan has not even claimed—let alone demonstrated— that Plymouth is incapable of providing him adequate medical care.  And as Sheriff MacDonald's Affidavit illustrates, Plymouth has developed a comprehensive plan to provide appropriate medical care to detainees in the event that they contract COVID-19, both at its own facilities and—if necessary—by transporting them to a hospital less than a mile away.  *See* Exhibit 1 at 1.

In a case like this, where the defendant presents no unique vulnerabilities to COVID-19, and a statutory presumption in favor of detention applies due to the defendant's danger to the community and flight risk, the Government respectfully submits that detention is appropriate under 18 U.S.C. § 3142.  *See United States v. Abinader*, No. 19-cr-10377-MLW (D. Mass. April 1, 2020) (denying motion for release based on the COVID-19 pandemic where the defendant did "not raise[] any particularized concerns regarding his health condition or situation, but only systemic concerns that apply to all detained individuals," and the facts demonstrating his dangerousness to the community remain unchanged, explaining that "[a]bsent some particularized concern regarding the effect of the pandemic on Abinader, the balance still weighs in favor of detention."); *United States v. Martin*, No. CR PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020)

18

(finding that the COVID-19 pandemic was not new information warranting release even where the defendant suffered from asthma, high blood pressure, and diabetes, finding that these facts were "insufficient to rebut the proffer by the Government that the correctional and medical staff at [the detention facility] are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus."); *cf. United States v. Stephens*, No. 15-CR-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (finding that reconsideration of the defendant's detention was warranted in light of both the COVID-19 pandemic and a material change in the strength of the government's case).

## **<u>CONCLUSION</u>**

The COVID-19 pandemic is an unprecedented public health emergency and every facet of our Government is taking precautionary steps to slow the spread and impact. Plymouth is taking cautionary steps in that regard, and has thus far been successful in maintaining a safe environment for detainees, not one of whom has contracted COVID-19 in the more than six weeks since Massachusetts reported its first case. Even in the midst of this pandemic, the factors set forth in 18 U.S.C. § 3142 must still guide the Court in determining, on a case-by-case basis, whether pretrial release is appropriate, namely: whether there are conditions that can reasonably assure the safety of the community. In this case, for the reasons discussed above, the facts and circumstances warrant Roldan's pretrial detention.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By:     s/ Glenn A. MacKinlay
        Glenn A. MacKinlay

Rachel E. Goldstein
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

s/ Glenn A. MacKinlay
Glenn A. MacKinlay
Assistant U.S. Attorney

Date: April 27, 2020